In re: Nadine Ann MILLER.

Appeal of: Nadine Ann Miller, Appellant.

Superior Court of Pennsylvania.

Submitted Jan. 21, 2003.
Filed May 14, 2003.

**1208**

Audrey E. Woloshin, York, for appellant.

BEFORE: JOHNSON, LALLY-GREEN, and POPOVICH, JJ.

OPINION BY JOHNSON, J.:

¶ 1 We are asked to determine whether a court may deny an individual's petition to change her name to that of her life companion on the basis of the trial court's individual perception that the change offends the law and public policy. We are guided by our Supreme Court's admonition that, in matters involving a name change, a court's discretion must be exercised "in such a way as to comport with good sense, common decency and fairness to all concerned and to the public." *Petition of Falcucci,* 355 Pa. 588, 592, 50 A.2d 200, 202 (1947). We find that the petitioner has satisfied all statutory requirements, and there appears no evidence

of record supporting the court's conclusion that the name change would violate public policy. Consequently, we conclude that the trial court abused its discretion in denying the petition. Accordingly, we reverse the order denying relief and remand with directions that the trial court grant the petition.

¶ 2 On April 30, 2002, Nadine Ann Miller (Petitioner) filed a Petition for Change of Name pursuant to 54 Pa.C.S. §§ 701(a), 702. The petition sought to secure a name change from Nadine Ann Miller to Nadine Ann Gingerich, in order that Petitioner might obtain the surname of her life companion. The petition averred that the change of name as requested was not made for the purpose of defrauding creditors or others. Attached to the petition was the Federal Bureau of Investigation Form FD–258 (Rev.12–29–82) containing Petitioner's fingerprints along with other identifying information.

¶ 3 Included in the certified record on appeal is the certification of the Pennsylvania State Police Central Repository indicating that Petitioner's fingerprint cards had been searched and that Petitioner is not subject to 18 Pa.C.S. Chapter 91 (relating to criminal history record information). *See* 54 Pa.C.S. § 702(b)(1), (2), (3) and (4). Also included in the record are: (1) the certification of Petitioner's attorney that there are no outstanding judgments or decrees of record against petitioner for the five years preceding the filing of the petition, and (2) the proofs of publication of the notice of application for name change, which appeared in the York Dispatch on Friday, June 7, 2002, and in the York Legal Record on Thursday, May 16, 2002. *See* Section 6 of the Act of December 16, 1982, P.L. 1309, 1337–38, Act No. 295 (setting forth the procedural requirements for compliance with 54 Pa.C.S. §§ 701(a), 702).

¶ 4 On July 1, 2002, a hearing on the petition was held before the Honorable John S. Kennedy. The only witness was Petitioner. After testifying to her residence addresses over the preceding five years, she stated that she desired to change her last name to Gingerich. In response to counsel's question as to the reason for the request for name change, Petitioner testified: "I'm taking the surname of my lifelong companion." Transcript of Proceedings (T.P.), 7/1/02, at 3. After Petitioner then testified that she did not have any creditors from whom she was trying to hide, the trial court asked how long Petitioner's companion had been her companion. *Id.* Petitioner replied: "Three months. We were— I was separated [from my husband] for five years living in the same house but living separately. I have not been living in that house for approximately four months." *Id.*

¶ 5 After Petitioner's counsel submitted the proofs of publication and the lien search certification, Judge Kennedy issued his ruling denying the petition *ex cathedra*, stating:

> **THE COURT:** All right. I have had this issue in front of me previously, and I did not ask whether Ms. Miller's companion is male or female. Frankly, [it] doesn't make a difference to me, but it has been my policy to deny these name changes because I believe it permits the party to have what would appear to the public to be a marriage when in reality it is not.
>
> The last one I had— and again I didn't inquire as to gender of her companion because it doesn't make a difference. The last one I had was a woman who came in [and] wanted to change her name to that of her fiance who was male, and I didn't permit it because in my opinion it would have bestowed upon the couple— it would have held them out to society as folks that were legally married, and, accordingly, I denied it for

that reason. So I am going to deny this petition for the same reason. You, of course, have 30 days to appeal.

T.P., 7/1/02, at 4. In his Opinion Pursuant to Pa.R.A.P. 1925(a), issued September 25, 2002, Judge Kennedy asserted that he denied the name change "because we felt that it violated public policy and would permit the Petitioner and her 'life long companion' to hold themselves out to the public as a married couple." Opinion, 9/25/02, at 1. The trial court conceded that Petitioner met the procedural requirements of 54 Pa.C.S. § 702, but concluded that "permitting the name change in this circumstance is against public policy." *Id.* The court went on to declare that it believed that "by permitting this name change we would sanction the creation of a type of domestic relationship that has not been legally recognized in this state." *Id.* at 2.

¶ 6 The record indicates that Petitioner was married, but was filing for divorce at the time of the hearing on the petition. T.P., 7/1/02, at 2. The trial judge, through questioning, established that Petitioner and her husband had been separated "for five years living in the same house but living separately." However, the trial judge did not place any weight on this factor in denying the petition and we, likewise, take no position on whether this factor would militate against the granting of the petition. No lawful objection to the granting of the petition was presented by any party at the hearing on the petition. *See* Section 6(b) of Act No. 295, December 16, 1982, P.L. 1309, 1338; *see also* 54 Pa.C.S. § 701 Historical and Statutory Note (providing procedural provisions for judicial change of name including right of any person having lawful objection to name change to appear and be heard, and further providing for name change decree where no lawful objection is advanced and

proofs of publication and official searches have been certified).

¶ 7 The record establishes that all procedural requirements for a judicial name change have been met. We turn now to a review of the standards that must guide our resolution of this case. Our Supreme Court has instructed that the established standard of review for cases involving petitions for change of name is whether or not there was an abuse of discretion. *In re Zachary Thomas Andrew Grimes*, 530 Pa. 388, 390 n. 1, 609 A.2d 158, 159 n. 1 (1992) (citing *Petition of Falcucci*, 355 Pa. at 591, 50 A.2d at 202). That Court has also provided us with an understanding of what constitutes an abuse of discretion, as follows:

> An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion.

*Harman v. Borah*, 562 Pa. 455, 469, 756 A.2d 1116, 1123 (2000) (citing *Coker v. S.M. Flickinger Co., Inc.*, 533 Pa. 441, 447, 625 A.2d 1181, 1184–85 (1993) and *Morrison v. Commonwealth, Dept. of Public Welfare*, 538 Pa. 122, 133, 646 A.2d 565, 571 (1994)). On matters involving petitions for a change of name, the Supreme Court has often cited the guiding principle first enunciated in *Falcucci*, where it declared:

> Whenever a court has discretion in any matter (as it has in the matter of a change of name) it will exercise that discretion in such a way as to comport with good sense, common decency, and

fairness to all concerned and to the public.

*Petition of Falcucci*, 355 Pa. at 592, 50 A.2d at 202, (cited and restated in *In the Matter of Robert Henry McIntyre (In Re McIntyre)*, 552 Pa. 324, 328, 715 A.2d 400, 402 (1998); *Grimes*, 530 Pa. at 392, 609 A.2d at 160).

¶ 8 This Court has also looked to *Falcucci* and has been governed by the same principle in reviewing matters involving change of name. *See In re Harris*, 707 A.2d 225, 227 (Pa.Super.1997); *In re Petition of Christjohn*, 286 Pa.Super. 112, 428 A.2d 597, 598 (1981). Our scope of review is limited to the question of whether the evidence is sufficient to support the decision reached by the hearing court. *Christjohn*, 428 A.2d at 599. If we find the evidence sufficient we must affirm, even if based on the same evidence we would have reached a different conclusion. *See id.*

¶ 9 "The court of common pleas of any county may by order change the name of any person resident in the county." 54 Pa.C.S. § 702(a). The act providing for a judicial change of name does not contain criteria limiting the court's discretion upon a name change petition. However, a person who violates the provisions of the statute "for purpose of avoiding payment of taxes or other debts" may be found guilty of a summary offense. *See* 54 Pa.C.S. § 705. Without court approval, "a person may at any time adopt and use any name if such name is used consistently, nonfraudulently and exclusively." 54 Pa.C.S. § 701(b). Our Supreme Court has reviewed the statute and the procedures thereunder and concluded that they "indicate a liberal policy regarding change of name requests." *Grimes*, 530 Pa. at 392, 609 A.2d at 160. The *Grimes* court observed that "[t]he necessity for judicial involvement [in name change cases] centers on governmental concerns that per-

sons not alter their identity to avoid financial obligations." *Id.* More recently, and while citing *Grimes,* then-Justice Stephen A. Zappala declared that "the primary purpose of the Judicial Change of Name Statute, other than with regard to minor children, is to prohibit fraud by those attempting to avoid financial obligations." *In re McIntyre,* 552 Pa. at 328, 715 A.2d at 402.

¶ 10 How do these standards inform our review of the denial of the petition in the case now before us? The grounds that the trial court set forth as justification for the denial of the petition had nothing to do with avoidance of financial obligations. Judge Kennedy first declared that he had denied an earlier petition on the basis that granting the petition would have "bestowed upon the couple— it would have held them out to society as folks that were legally married, and, accordingly, I denied it for that reason." T.P., 7/1/02, at 4. Judge Kennedy indicated that he was denying the petition on this appeal "for the same reason." *Id.*

¶ 11 We find instructive our Supreme Court's analysis in *In re McIntyre.* There, a fifty-three year old male transsexual had held himself out as a woman in all respects with the exception of his employment as a maintenance worker for a municipal parking authority. *See In re McIntyre,* 552 Pa. at 326, 715 A.2d at 401. He was generally known as Katherine Marie McIntyre, the name under which he leased his apartment, maintained various bank accounts and credit cards and was enrolled in membership in local organizations. *See id.* He petitioned to change his name from Robert Henry McIntyre to Katherine Marie McIntyre, testifying that his employer would not recognize him as a female until it received legal recognition of his name change. *See id.* at 327, 715 A.2d at 401. Of equal importance, he argued that a pre-requisite to sex-reassignment

surgery required the patient to undergo living for a full year in all aspects of his life in the gender he desires. *See id.* at 326, 715 A.2d at 401.

¶ 12 The trial court denied the petition, holding that it would not grant legal recognition of his name change until he underwent sex-reassignment surgery, finding that granting the name change was premature and would be deceptive to the public and his co-workers. *See id.* at 327, 715 A.2d at 401–02. On appeal, this Court affirmed that denial on the basis of the trial court's opinion. In reversing this Court and in granting the petition, our Supreme Court noted that the petitioner was judgment free and was not seeking a name change to avoid any financial obligations. *See id.* at 328–329, 715 A.2d at 402–403. The Court stated:

> The fact that [petitioner] is a transsexual seeking a feminine name should not affect the disposition of his request.
>
> The Superior Court of New Jersey espoused a similar view in *The Matter of William Eck,* 245 N.J.Super. 220, 584 A.2d 859 (1991). . . .
>
> Likewise, we find that there is no public interest being protected by the denial of Appellant's name change petition. The details surrounding Appellant's quest for sex-reassignment surgery are not a matter of governmental concern. As the name change statute and the procedures thereunder indicate a liberal policy regarding change of name requests, *In re: Grimes,* 530 Pa. 388, 609 A.2d 158 (1992), we see no reason to impose restrictions which the legislature has not.

*In re McIntyre,* 552 Pa. at 328–29, 330, 715 A.2d at 402–03.

¶ 13 In the same manner that our Supreme Court found wisdom in the reasoning of the most distinguished Superior Court of New Jersey, Appellate Division, we have been equally guided by a more

recent pronouncement by a panel of that court. In a case raising the identical issue we here must resolve, the Appellate Division held that the denial of a request for a change of name to include the last name of petitioner's same-sex partner was "a misapplication of judicial discretion." *In re Application for Change of Name by Bacharach (In re Bacharach)*, 344 N.J.Super. 126, 136, 780 A.2d 579, 585 (2001). There, as here, an order was entered fixing a date for a hearing on the name change request. *See id.* at 129, 780 A.2d at 580. Publication was made and copies of the order were sent to both the County Prosecutor and the New Jersey Attorney General. *See id.* As in the case now before this Court, a criminal background check disclosed no criminal record, and no objection to the name change was received from the County Prosecutor, the Attorney General, or from any member of the general public. *See id.*

¶ 14 The hearing judge expressed concern that approval of the name change would give the appearance of approval of a same-sex marriage. *See id.* The Appellate Division quotes the hearing judge as opining (in content similar to that now before us):

> The point is that this Court is particularly concerned with an impression or an appearance. If I grant such a petitioner—a petition, rather, to the outside world, which in this case would be the immediate neighborhood or their social contact, their work related, their church, other places of worship, people in the apartment, where they go shopping and so forth, bank accounts, social security, credit cards and so forth, because if it becomes—if I grant it, it would be legal and then we would have a union of some sort between the two, representing to all people that there's some sort of a union here; there's some sort of a marriage here; there's some sort of a civil contract to represent to these people in

general that they're together. And that is not legal as of today.

*Id.* at 129, 780 A.2d at 580. The New Jersey court observed that the hearing judge had denied the name change based on that court's perception of the law and public policy of New Jersey against recognition of same-sex marriage. *See id.* In rejecting the trial court's decision, the Appellate Division observed that "[I]t is well settled that an adult can legally and properly change his or her name at will and without need of judicial approval simply by using the desired name in ordinary life so long as the adopted name is not used for a criminal or fraudulent purpose." *Id.* at 130, 780 A.2d at 582. The law is the same in this Commonwealth. *See* 54 Pa.C.S. § 701(b) (intended as codification of existing law); *Matter of Montenegro*, 365 Pa.Super. 98, 528 A.2d 1381, 1383 (1987).

¶ 15 The *Bacharach* court noted that there had been few reported cases in which a court had denied a requested name change. *See id.* at 132, 780 A.2d at 583. It cited to an earlier case in which it had reversed a hearing judge's denial of a married woman's application to resume use of her maiden name, in spite of no objections having been filed and no evidence of any fraudulent intent. *See id.* at 132, 780 A.2d at 583 (citing *In re Bonnie Lee Daniels Lawrence (Application of Lawrence)*, 128 N.J.Super. 312, 319 A.2d 793 (Cty.Ct.1974) rev'd 133 N.J.Super. 408, 337 A.2d 49 (App.Div.1975)). There, the trial judge gave as his reason for denying the petition, "This court has great concern for the stability of the family and the marriage." *Application of Lawrence*, 128 N.J.Super. at 327, 319 A.2d at 801. In reversing, the *Bacharach* court held, in effect, that a name change request should not be denied "simply because a judge disputes the wisdom of the request or disagrees with the reason for the change based on his or her personal views or

philosophy." *Bacharach*, 344 N.J.Super. at 132, 780 A.2d at 583 (citing *Application of Lawrence*, 133 N.J.Super. at 413–14, 337 A.2d at 52).

¶ 16 The highest court in our sister state of Ohio has examined the same issue we now review, under similar law, and has reached the same result as our esteemed colleagues on the New Jersey Appellate Division court. *See In re Bicknell*, 96 Ohio St.3d 76, 771 N.E.2d 846 (2002). There, two women filed individual applications seeking to have their surnames changed to "Rylen", a combination of letters from both of their last names. *See id.* at 76, 771 N.E.2d at 847. A magistrate first denied both applications, writing: "To grant their petitions would be contrary to the public good, contrary to encoded public policy, and contrary to natural law." *Id.* The probate court next denied the applications on different grounds, concluding, "It is not reasonable and proper to change the surnames of cohabiting couples, because to do so would be to give an aura of propriety and official sanction to their cohabitation and would undermine public policy of this state which promotes legal marriages and withholds official sanction from non-marital cohabitation." *Id.* The Ohio Court of Appeals affirmed the probate court's denial, holding, "We find that there is support for the trial court's determination that Ohio law favors solemnized marriages and that cohabitation contravenes this policy. Accordingly, the trial court did not abuse its discretion by finding that court sanctioning of the use of the same surname by two unmarried cohabitants is against Ohio's public policy promoting marriage." *Id.* The Supreme Court of Ohio granted *certiorari* and reversed. The *Bicknell* court considered the New Jersey position pronounced in *In re Bacharach*, along with this Commonwealth's position set forth in *In re McIntyre*. *Id.* at 77–78, 771 N.E.2d at 848–849. In finding that the cohabiting, unmarried partners' name change requests were reasonable and proper under the statute governing name changes, the Ohio court declared:

> In the case at bar, appellants' only stated purpose for changing their names is to carry the same surname to demonstrate their level of commitment to each other and to the children that they planned to have. Both acknowledge that same-sex marriages are illegal in Ohio, and it is not their intention to have this court validate a same-sex union by virtue of granting the name-change applications. Any discussion, then, on the sanctity of marriage, the well-being of society, or the state's endorsement of non[-]marital cohabitation is wholly inappropriate and without any basis in law or fact.

*Id.* at 78, 771 N.E.2d at 849. In citing to our own Supreme Court's decision in *In re McIntyre*, the *Bicknell* court quoted our Court in declaring: "As the name change statute and the procedures thereunder indicate a liberal policy regarding change of name requests, ... we see no reason to impose restrictions which the legislature has not." *Id.* (quoting *In re McIntyre*, 552 Pa. at 330, 715 A.2d at 403). This Court remains mindful of our intermediate appellate role that requires that we follow the instructions of our State Supreme Court. "The formal purpose of the Superior Court is to maintain and effectuate the decisional law of [the Pennsylvania Supreme Court] as faithfully as possible." *Commonwealth v. Dugger*, 506 Pa. 537, 545, 486 A.2d 382, 386 (1985); *accord Shearer v. Naftzinger*, 714 A.2d 421, 427 (Pa.Super.1998); *Commonwealth v. Busch*, 713 A.2d 97, 100 (Pa.Super.1998); *Commonwealth v. Brown*, 447 Pa.Super. 454, 669 A.2d 984, 988 (1995) (*en banc*).

¶ 17 Based upon the teachings of our State Supreme Court the exercise of discretion to deny a change of name runs

contrary to the common law and statutory policy in favor of granting such relief. *See In re McIntyre, supra* (reversing denial of name change petition brought by pre-operative transsexual male); *Petition of Falcucci, supra* (affirming decree granting change of name against objection and appeal of member of the Philadelphia Bar bearing same surname). We, as judges, have no monopoly on wisdom, no heightened discernment into the public mind and no right to impose personal views or values on the citizenry of this Commonwealth. *See Bacharach*, 344 N.J.Super. at 134, 780 A.2d at 584. If we look to the actions of our legislature and the decisions of our Supreme Court, we discern no basis for declining a name change that would enable an applicant to adopt the surname of the applicant's partner.

¶ 18 Shakespeare recognized the care with which we must approach a person's desire to change or modify their name where the playwright presents Iago addressing the Moor of Venice with the caution: "Good name in man and woman, dear my lord, is the immediate jewel of their souls." *Tragedy of Othello*, Act III, scene iii, 155. Where a court denies an application for adoption of a name change without anything on the record to support such denial, we rob the applicant of that which in no way enriches, or protects, the public and makes the applicant poor indeed.

¶ 19 In denying the application for name change in this matter, the trial court concluded that approval "would have held them out to society as folks that were legally married." T.P., 7/1/02, at 4. There is no evidence on the record to support the decision of the trial court. In its Rule 1925 Opinion, the trial court was persuaded by the decision reached by our sister intermediate appellate court in *Devlin v.*

*City of Philadelphia*, 809 A.2d 980 (Pa. Cmwlth.2002). That decision is inapposite and not helpful in deciding the issue here presented. In *Devlin*, the Commonwealth Court considered whether the City of Philadelphia had exceeded its powers, granted by certain acts of the General Assembly, in enacting three municipal ordinances providing for the status of "life partnership" between members of the same sex with respect to certain health benefits and exemption from realty transfer taxes. *See Devlin*, 809 A.2d at 981–83. The court held that the City's action in creating and regulating Life Partnerships as a marital status and new type of domestic relationship was beyond the City's power as a municipal corporation. *See id.* at 990–992. The court further held that the General Assembly had preempted the field of the marital relationship between two people in Pennsylvania. *See id.* The *Devlin* court did not have before it, nor did it consider, the narrow issue here presented, whether an application for a change of name to assume the surname of a life partner is prohibited under either the public policy of this Commonwealth or the Judicial Name Change Act, 54 Pa.C.S. §§ 701–705. We do not believe the *Devlin* decision is relevant on the issue now before this Court.

¶ 20 Finding nothing to support the trial court's single reason for denial, and given the strong, liberal policy regarding change of name requests, we can only conclude that the trial court has misapplied its judicial discretion. *See In re McIntyre, supra; Petition of Falcucci, supra; In re Harris, supra.* The petitioner is entitled to have her application favorably received. We will reverse the order denying the petition and remand the matter for entry of an order granting the relief sought by petitioner.

¶ 21 Order entered July 25, 2002 **REVERSED.** Case **REMANDED WITH DIRECTIONS.**

¶ 22 Judge LALLY–GREEN Concurred in the Result.